# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

### CIVIL NO. 1:05CV329

KIMBERLY J. WILLIAMS,      )
                         )
          **Plaintiff,**      )
                         )
         **v.**             )
                         )     **MEMORANDUM**
JO ANNE B. BARNHART,       )     **AND ORDER**
**Commissioner of Social**      )
**Security,**                    )
                         )
        **Defendant.**      )
_____ )

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment.

## I. STATEMENT OF FACTS

The Plaintiff filed her applications for social security disability benefits and supplemental security income on March 26, 2003, alleging a disability onset date of September 6, 2002. **Transcript of Proceedings, filed January 11, 2006, at 89-91.** Her applications were denied initially and upon reconsideration; the Plaintiff thereafter filed a timely request for

hearing before an Administrative Law Judge (ALJ).  *Id.*, at 81-86.  Such

hearing was conducted on May 21, 2004.  *Id.*, at 34-71.

At the time of the hearing, the Plaintiff was a 47-year old divorced

mother of three children, with a college degree in social work.  *Id.*, at 38-

39.  She had not worked since filing for disability benefits in September

2002.  Her reason for stopping work was due to injuries she sustained as a

result of a purse snatching/mugging that occurred on September 6, 2002.

*Id.*, at 40, 133.  She last worked as a director of marketing and sales from

April to September 2002.  Her duties involved computer and telephone

skills, mailings and presentations, and some business travel; this job

required minimal physical exertion.  *Id.*, at 41.  Prior to this job, she worked

primarily in sales promotion for Hewlett Packard.  *Id.*, at 42.  She also

testified that she had experience working in social services but switched to

sales because her children were getting ready for college and she needed

a job where the pay was better.  *Id.*, at 64.  The Plaintiff testified regarding

the purse snatching incident as being physically and emotionally injurious

causing her to suffer from shock, nerve and tissue damage to her back,

neck, shoulder, entire spine, headaches, and continuous pain.

She testified that she can no longer lift even her purse; she cannot sit or stand for more than a minute or two; on a "good" day, she is only able to walk a maximum of a city block; she can climb only two or three stairs without assistance; since her left arm was injured in the incident and she is left handed, she has trouble writing; she suffers weakness in both her arms and hands, especially on the left, and her grip strength is poor; she ambulates with assistance from a cane especially if she is going to the grocery store, for example; she experiences problems with balance and has fallen in the bath tub "a couple of times;" and she only sleeps four hours a night because of the pain. *Id.*, **at 44-50.**

Plaintiff also testified to the degree of pain she suffers. She testified that the pain starts at the middle part of her neck and radiates down through her left shoulder and that such pain is continuous. *Id.*, **at 51.** She also testified that she suffers from occipital neuralgia that causes pain so severe that she has to have morphine for the pain to subside. *Id.* The Plaintiff also testified suffering from continuous pain in her feet, shoulders, low back and neck that rates on the pain scale from moderate (5) to severe (10). *Id.*, **at 52.** Plaintiff testified that the pain is sometimes so extreme that it causes "everything" to become numb and she loses feeling in her

legs; that the pain in affected by the weather and temperature and she cannot tolerate the "heat or cold;" and that she experiences severe headaches several times a month, especially when she overextends herself. ***Id.*, at 53-54.** Her pain also makes it difficult for her to concentrate or think clearly; she also testified that the mugging incident and its lasting effects on her health have caused her to suffer from depression. ***Id.*, at 54.**

In response to the ALJ's questions, the Plaintiff testified that before moving to North Carolina, she was treated primarily by a chiropractor in Florida; that she could not afford mental health treatment because she could not live without her pain medication; that cortisone shots did not help alleviate the pain; that surgery had been mentioned, but was "risky" and not recommended at this time; and anti-depressant drugs caused unacceptable side effects. ***Id.*, at 56-58.** She testified that she has attempted to have some recreation, but outings are usually spoiled by a spike in her pain which causes her to be bedridden for several days afterward. ***Id.*, at 58-59.** She drives a car on rare occasions and then only for short distances. ***Id.*, at 59.** She does little housework; she cannot use the vacuum cleaner, clothes dryer, or wash dishes; she cannot dress herself or bathe without help; and her appetite varies depending on what

type of medication she is currently taking. *Id.*, at 56-60.  A physical

therapist has helped somewhat, but "as a well educated person" she

concludes that most doctors are incompetent and do not listen to her. *Id.*,

at 61-62.

A vocational expert was present and testified during the hearing.

Based upon a hypothetical question proposed by the ALJ, assuming, *inter*

*alia*, the Plaintiff's exertional impairments and non-exertional restrictions,

the vocational expert testified that the Plaintiff was capable of performing

unskilled, light work of a sedentary nature in office settings working with

photocopying machines, folding or inserting or collating, sealing and

cancelling, or working within a mail (non-governmental) department which

involved sorting, weighing and stamping of mail. *Id.*, at 66-67.  These

types of jobs existed in large numbers, some 2,100 to 2,500 positions, in

North Carolina, with larger numbers available in the national economy. *Id.*,

at 67.  The vocational expert also testified that the Plaintiff could perform

any of her past work if the limitation on extensive interaction with large

numbers of people or co-workers was removed. *Id.*, at 68.  Based on a

hypothetical question by Plaintiff's attorney, which assumed the factors

posed by the ALJ and the additional limitation that Plaintiff would require

intermittent periods to lie down, the vocational expert testified that none of the jobs mentioned would permit such rest periods. *Id.* The attorney asked the vocational expert to factor into the hypothetical the Plaintiff's limitation on her ability to think or concentrate because of the amount of pain she suffers. The vocational expert testified that if the Plaintiff did indeed suffer continual severe pain that would "interfere even with the performance of routine and repetitive kinds of functions," then none of the jobs mentioned would be appropriate. *Id.***, at 69.**

The record contains medical records from September 23, 2002, through May 17, 2003, from Dr. Steven M. Pollack, chiropractor in Florida, detailing Plaintiff's visits on approximately 60 to 70 occasions. *Id.***, at 280-307.** During this period, Plaintiff complained to Dr. Pollack of back and neck pain with spasms, headaches, shoulder pain, and tenderness to palpation. Treatments included hot pack, low volt electrical stimulation, and spinal adjustments. *Id.* On June 2, 2003, Dr. Pollack wrote to the Florida Office of Disability Determination and advised that the Plaintiff had "a permanent impairment" from the injuries she sustained in the September 2002 mugging incident. *Id.***, at 270.** He further advised that he did not

anticipate  her condition would improve and she was "not able to be employed at even the most menial task." *Id.*

On October 25, 2002, Plaintiff underwent an MRI of her lumbar spine performed in the weight-bearing neutral sitting position. *Id., at 272.*  The radiologist found apparent "focal midline posterior subligamentous disk herniation and associated radial tear at T11-12" and "disc bulging at L4-5 resulting in spinal stenosis[.]" *Id., at 273.*  However, there was normal alignment of the vertebral bodies without evidence of compression fracture or spondylolisthesis[1] or nerve root impingement.  At a subsequent MRI of the cervical and thoracic areas of the spine (again performed in the weight-bearing neutral sitting position) on January 17, 2003, the radiologist found "straightening of the cervical spine suggestive of underlying musculoligamentous strain [and] disc bulging at C4-5, C5-6 and C6-7." *Id., at 275.*  There was no evidence of acute fracture, dislocation, or prevertebral soft tissue swelling. *Id., at 274.*  At the sites where the radiologist determined disc bulging, there was no evidence of any cord compression or exiting nerve root impingement. *Id*.  As to the thoracic

---

[1] The "forward displacement of one vertebra over another[.]" *Dorland's Illustrated Medical Dictionary*, 1563 (28th ed.).

spine, the radiologist found "disk bulge and superimposed focal midline posterior subligamentous disk herniation and associated radial tear at T11-12." ***Id.*, at 277.** Additionally, the films showed a normal alignment of the vertebral column without evidence of compression fracture or spondylolisthesis. Even at the radial tear located at T11-12, there was no evidence of cord compression or exiting nerve root impairment "at this level at this time." ***Id.*, at 276.**

On February 27, 2003, the Plaintiff was referred by Dr. Pollack to Dr. F. Gary Gieseke, a neurosurgeon. ***Id.*, at 309.** On examination, Dr. Gieseke noted the Plaintiff was "tense, nervous, depressed" with marked tenderness to back palpation; decreased mobility but no spasm or evidence of atrophy; tenderness was noted across the "trapezia, thoracic and lumbar region[;]" some decreased sensation in the left arm and right leg; no definite motor weakness; and largely equal motor reflexes. He confirmed the radiologist's findings on the MRI's of mild herniation of the T11-12 with chronic thoracic and lumbosacral sprain, chronic cervical sprain and disc protrusion, occipital neuralgia,[2] and reactive depression.

---

[2] "Pain in the distribution of the occipital nerves, due to pressure or trauma to the nerve." ***Dorland's, supra*, 1127.**

*Id.*, **at 310.** Dr. Gieseke determined that surgery was not indicated at that time and recommended the Plaintiff continue conservative treatment and the use of a transcutaneous electrical nerve stimulator on an out patient basis. *Id*. He also recommended that the Plaintiff consider discontinuing the use of her addictive medications Soma and Lorcet and substituting Skelaxin and Talwin. *Id.*, **310-11.**

The record contains Plaintiff's medical records from the Emery Neuroscience Center in Ft. Lauderdale, Florida, for the period September 6, 2002, through June 24, 2003. *Id.*, **at 177-236.** On her first visit to the center, the Plaintiff complained of pain in her neck and back. *Id.*, **at 196.** The Plaintiff was evaluated by Dr. Waden E. Emery, III, who diagnosed her with cervical, thoracic and lumbar strains, greater occipital neuralgia, and migraine headaches. He also noted that he had reviewed the MRI films and determined that the various areas of the spine were "essentially normal." *Id.*, **at 189.** On April 2, and 10, 2003, the Plaintiff was given a battery of tests at the Emery Center. *Id.*, **at 204-18, 228-29.** The valsala maneuver report showed no signs of cardiovagal or adrenergic dysfunction (*id.*, at 206); the heart rate deep breathing report was within normal limits and revealed no signs of cardiovagal dysfunction (*id.,* at 208); the Q-SART

study of all four extremities revealed decreased sweat consistent with a generalized autonomic neuropathy (*id*., at 211); a normal median nerve somatosensory test (*id*., at 214); an abnormal nerve conduction velocity test on the right upper extremity consistent with carpal tunnel syndrome, but was normal on the left (*id*., at 216); and an abnormal tilt table test showed excessive blood pressure oscillations consistent with grade I orthostatic intolerance[3] (*id*., at 229).

On May 30, 2003, Dr. Emery noted that the Plaintiff presented with a new complaint of burning in her feet and she also requested another pain medication.  ***Id*., at 178.**  On June 24, 2003, Dr. Emery addressed a letter "To Whom It May Concern" advising:

> [The Plaintiff] is currently under my care for her neurologic conditions including herniated disc at T11-12 in her thoracic spine, and disc bulges at L4-5 in her lumbar spine and at C4-5, C5-6, and C6-7 in her cervical spine, as well as greater occipital neuralgia and carpal tunnel syndrome on the right side.  The patient does suffer significant symptoms as a result of these conditions; however, I do not feel surgery is indicated at this time . . . .  The patient does require continued medical treatment and should continue on her current regimen of medication and physical therapy as indicated.

***Id*., at 236.**

---

[3] Pain caused when standing erect.  ***Dorland's, supra*, 1194.**

On July 18, 2003, the Plaintiff was seen by Dr. Frederick E. Whiskin for a psychiatric evaluation. *Id.*, at 330-33. He diagnosed the Plaintiff as suffering from "depressive disorder [not otherwise specified]," in part due to unresolved grief in the death of her mother; pain associated with the depression and trauma resulting from the purse snatching incident; he ruled out post-traumatic stress syndrome; determined that Plaintiff used denial as a defense; chronic pain; and financial insecurity. *Id.*, at 333. He found Plaintiff capable of handling her own benefits if awarded. *Id.*

On July 25, 2003, Plaintiff was seen by Dr. John J. Kelly for a consultative examination. *Id.*, at 334-39. Plaintiff related to Dr. Kelly the details of her back injury; as a result thereof, she advised that she suffered from severe headaches, "five bulging discs, one herniated disc," and depression. After a detailed examination and review of all body systems, Dr. Kelly concluded that the Plaintiff suffered from a spinal injury which was stable but had not improved; severe headaches which were stable but not improved; the report of bulging and herniated discs needed further evaluation; and there needed to be further evaluation of her complaints of depression and possible post traumatic stress syndrome. *Id.*, at 338.

On August 1, 2003, Dr. William Farley assessed the Plaintiff's

residual functional capacity based on his review of the medical reports
including Dr. Pollack's letter of June 2, 2003.  ***Id.*, at 164-71.**  He
concluded that she could lift and carry 10 pounds frequently and 20
pounds occasionally; sit, stand and/or walk for about 6 hours out of an 8-
hour workday; there was no limitation in her ability to push and/or pull; she
was limited in balancing, stooping, and crouching only occasionally; she
was limited in her ability to reach overhead using her left arm only
occasionally; she had no visual or communications limitations; and she
should avoid concentrated exposure to noise and hazards such as
machinery and heights.  ***Id.***

On July 28, 2003, Arlene M. Cooke, Ph.D., performed a
psychological assessment of the Plaintiff.  ***Id.*, at 146-63.**  After review of
the Plaintiff's medical records, Dr. Cooke determined that the Plaintiff
suffered from a depressive disorder not otherwise specified that included
"unresolved grief regarding the death of her mother" as well as anxiety
from "recurrent and intrusive recollections of a traumatic experience, which
are a source of marked distress."  ***Id.*, at 149, 151.**  Dr. Cooke also
determined that the Plaintiff suffered from a pain disorder associated with
depression and trauma (due to the purse snatching incident).  ***Id.*, at 152.**

Based on these findings, the Plaintiff possessed a mild limitation in her restriction of daily activities and in maintaining social functioning, and a moderate limitation in her ability to maintain concentration, persistence, or pace; she was moderately limited in her ability to carry out detailed instructions, maintain concentration for extended periods, perform activities within a schedule, and complete a normal work week; and she was moderately limited in her ability to respond to changes in the work setting. *Id.*, **at 156-61.** It was Dr. Cooke's opinion that the Plaintiff was capable of performing simple tasks in a low stress environment. *Id.*, **at 162.**

On October 12, 2003, the Plaintiff underwent a CT scan of her cervical spine and head at Rutherford Hospital in Rutherfordton, North Carolina. The films revealed no abnormalities in Plaintiff's cervical spine or brain. *Id.*, **at 350-51.**

On January 13, 2004, the Plaintiff was examined at the Ellenboro Medical Center by Dr. Brent Gill. *Id.*, **at 361-62.** After a thorough examination, Dr. Gill confirmed diagnoses made by Plaintiff's previous physicians. Specifically, he diagnosed her as suffering from myofascial[4]

---

[4] "Pertaining to or involving the fascia surrounding and associated with muscle tissue." ***Dorland's, supra*, 1092.**

and cervical strain, occipital headaches (possible occipital neuralgia), history of mild herniation of T11-12 along with mild disc protrusion, post traumatic stressors ("I think a significant psychological component to her symptoms"), nicotine abuse, and probable situational type depression. *Id.,* **at 362.** The last report from Dr. Gill is dated February 10, 2004, where the Plaintiff presented not only with her same complaints but also with upper respiratory congestion. Dr. Gill treated her sinusitis with antibiotics and changed her pain medication to Biohist and Hydrocodone (20 doses, no refills) for the significant pain she was experiencing in her neck and upper back. He further noted that he was referring the Plaintiff to a pain clinic and a psychiatrist. *Id.***, at 364.**

On February 4, 2004, Plaintiff was examined at Rutherford Psychiatric and Counseling Services on referral from Dr. Gill. *Id.***, at 375-78.** The intake evaluation mentions that Plaintiff was angry with Dr. Gill for not prescribing Loratab or a similar narcotic analgesic for pain. *Id.***, at 378.** The diagnostic impression lists adjustment disorder, depression, and pain. *Id*.

On March 5, 2004, the Plaintiff was seen by the Pain Clinic of Shelby on referral from Dr. Gill. *Id.***, at 373-74.** Based on her complaints, it was

determined that the Plaintiff should see an orthopedist for an evaluation before the clinic began any treatment. *Id.*, **at 374.** Therefore, On April 2, 2004, Dr. Patrick Hayes with the Miller Orthopaedic Clinic examined the Plaintiff and determined that she had limited range of motion in her left shoulder secondary to soreness and pain "of unclear etiology" and ordered an MRI. *Id.*, **at 379.** Following the procedure on April 20, 2004, he reviewed the MRI and determined that there was "tendinosis in the left supraspin[ous] insertion but no clear tear" of the cuff. *Id.*, **at 380.** He diagnosed bursitis in the Plaintiff's left shoulder with impingement. *Id.* She was given an injection into the left shoulder and prescribed Darvocet. *Id.* Dr. Hayes referred her to an orthopedist with a specialty in back pain.

On April 27, 2004, Dr. Sam Bhagia examined the Plaintiff on referral from Dr. Hayes. *Id.*, **at 382.** His diagnoses included chronic myofascial pain syndrome and opiate dependence. *Id.*, **at 383.** He further stated:

> I cannot find any objective spinal pathology which is corroborative of her presenting symptoms. There is no evidence of neurological compromise that would warrant surgical intervention. She is suffering from chronic myofascial syndrome with functional overlay. She would benefit from a comprehensive pain management program incorporating physical therapy, a psychologist and adjuvant pain medications. It is unlikely that she would benefit from any interventional techniques[.]

***Id.*, at 383-84.**

Taking into account the various testimony and documentary evidence, the ALJ found Plaintiff was not entitled to disability insurance benefits or supplemental security income. ***Id.*, at 28.** The ALJ's decision was subsequently confirmed by the Appeals Council on September 8, 2005. ***Id.*, at 6.** Plaintiff filed the current action on November 4, 2005, seeking review of such decision. ***See*, Complaint, filed November 4, 2005.** After Defendant Commissioner filed her answer, both parties moved for summary judgment.

## II. STANDARD OF REVIEW

### A. Denial of Social Security Disability Benefits

For purposes of Social Security disability insurance benefits, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A).** The regulations prescribe a five-step sequential process for determining disability. ***See*, 20 C.F.R. § 404.1520**

**(a)(4).**  The first step requires a determination of whether the claimant is engaged in "substantial gainful activity;" if so, a claim for disability benefits will be denied.  **20 C.F.R. § 404.1520(a)(4)(i).**  If the claimant is not so engaged, the second step is to determine whether the claimant has a severe medically determinable physical or mental impairment (or combination of impairments) that is expected to result in death, or that has lasted or can be expected to last for a continuous period of at least twelve months.  **20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1509.**  If such impairment does not exist, a finding of "not disabled" is entered.  However, if a claimant does suffer from such an impairment, the analysis moves to the third step which requires a consideration of the medical severity of the impairment or combination of impairments.  **20 C.F.R. § 404.1520(a)(4)(iii).**  If the impairment or combination of impairments meets or equals one of the listings provided in Appendix I of 20 C.F.R. Part 404, subpart P, a finding of "disabled" is warranted and the analysis will terminate.  **20 C.F.R. § 404.1520(a)(4)(iii).**  If a claimant cannot satisfy the third step, the analysis moves forward to a consideration of the claimant's past relevant work and residual functional capacity.  If the claimant can perform her past relevant work, the analysis ends and a determination of "not disabled" is

appropriate.  **20 C.F.R. § 404.1520(a)(4)(iv).**  If the claimant cannot

perform her past relevant work, the fifth and final phase of the sequential

process requires a determination of whether, taking account of the

claimant's residual functional capacity, education, age, and past work

experience, the claimant can make an adjustment to other work that exists

in significant numbers in the national economy.  **20 C.F.R. §§**

**404.1520(a)(4)(v), 404.1560(c).**  Only if the claimant cannot make such an

adjustment will she be considered "disabled."  **20 C.F.R. § 404.1520**

**(a)(4)(v).**

Where a claim for Social Security disability benefits has been denied

and the case presented to a district court, the Court does not conduct a *de*

*novo* review of the decision of an ALJ.  ***See, Smith v. Schweiker*, 795**

**F.2d 343,345 (4th Cir. 1986).**  Rather, the Court "must uphold the factual

findings of the Secretary if they are supported by substantial evidence and

were reached through application of the correct legal standard."  ***Craig v.***

***Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Pittman v. Massanari*, 141**

**F.Supp.2d 601, 605-06 (W.D.N.C. 2001); 42 U.S.C. § 405(g).**  "Substantial

evidence" means "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," and "consists of more than a

mere scintilla of evidence but may be somewhat less than a

preponderance.  If there is evidence to justify a refusal to direct a verdict

were the case before a jury, then there is substantial evidence." *Harrison*

*v. Comm'r of the Soc. Sec. Admin.*, **201 F.3d 436 (table), 1999 WL**

**991418, at \*1 (4th Cir. 1999) (citations and internal quotations omitted).**

> In reviewing for substantial evidence, the reviewing court does
> not reweigh conflicting evidence, make credibility
> determinations, or substitute its judgment for that of the
> Commissioner.  *See Hays v. Sullivan*, 907 F.2d 1453, 1456
> (4th Cir. 1990).  If, in the face of conflicting evidence,
> reasonable minds could differ as to whether a claimant is
> disabled, it is the Commissioner or the ALJ who makes the
> decision.  *See Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.
> 1987).  Accordingly, the issue before the Court is not whether
> [Plaintiff] "is disabled, but whether the ALJ's finding that she is
> not disabled is supported by substantial evidence and was
> reached based upon a correct application of the relevant law."
> *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

*Harrison*, **1999 WL 99148, at \*1.**

**B. Summary Judgment**

Each party has moved for summary judgment pursuant to Federal

Rule of Civil Procedure 56.  Summary judgment is appropriate if there is no

genuine issue of material fact and judgment for the moving party is

warranted as a matter of law.  **Fed. R. Civ. P. 56(c).**  "A genuine issue

exists 'if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.'"  ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.**

**1994) (quoting, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248**

**(1986)).**

Where, as here, both parties have moved for summary judgment, the

Court will consider each motion separately.  ***Massie v. Bd. of Trs.*, 357**

**F.Supp.2d 878, 881 (W.D.N.C. 2005).**  In doing so, the evidence must be

viewed in a light most favorable to the nonmoving party, and all reasonable

inferences must be drawn in the nonmoving party's favor.  ***See, Anderson***

***v. Westinghouse Savannah River Co.*, 406 F.3d 248, 259 (4th Cir. 2005).**

The party opposing a motion for summary judgment "may not rest upon the

mere allegations or denials of the . . . pleading[s], but [must] . . ., by

affidavits or as otherwise provided in [Rule 56], . . . set forth specific facts

showing that there is a genuine issue for trial."  **Fed. R. Civ. P. 56.**

## III. ANALYSIS

Plaintiff presents seven issues as bases on which she believes the Court should reverse the ALJ's finding that she is not disabled or, alternatively, remand the case to the ALJ.

The Plaintiff contends that the ALJ failed to give proper weight to the opinions of her treating physicians, did not properly evaluate her mental impairments in the manner required by 20 C.F.R. § 404.1520(a), failed to list her severe impairments or consider the combined effect thereof, and failed to consider all medical evidence of record. **Plaintiff's Memorandum in Support of Motion for Summary Judgment, filed March 17, 2006, at 1-2.** Plaintiff further contends that the evidence, both objective and subjective, should have resulted in the ALJ finding the Plaintiff disabled. *Id*. In reviewing such determination, this Court looks only to whether the ALJ's decision is "supported by substantial evidence and [was] reached through application of the correct legal standard." *Craig, supra*. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Harrison, supra*. The Court will not weigh evidence nor will it make credibility determinations. *Id*. Having reviewed the entire proceedings of record, the Court concludes that the Plaintiff's combination of impairments did not render her disabled for

purposes of entitlement to a period of disability and disability insurance benefits as concluded by the ALJ. **Transcript of Proceedings, at 28.**

The ALJ properly considered the record of treatments by Dr. Pollack, some 65-70 in total, the Plaintiff's treating chiropractor. He also considered Dr. Pollack's letter stating his opinion that the Plaintiff was permanently and totally disabled and unable to work. ***Id.*, at 23.** This consideration was consistent with the requirements of 20 C.F.R. § 416.913(a)(1). He gave Dr. Pollack's opinion "little weight" since it was "not well supported by the evidence of record and appear[ed] to be based solely on the [Plaintiff's] subjective complaints." ***Id***.

The ALJ further found Plaintiff's subjective complaints not to be credible, considering the substantial number of opinions to the contrary by various medical experts who did not support the Plaintiff's contentions. ***Id.*, at 25.** "The [Plaintiff's] testimony as to the intensity, persistence, and limiting effects of her pain is not persuasive in view of the inconsistences in the record." ***Id.*** "[I]n order for pain to be found disabling, there must be objective medical evidence establishing some condition that could reasonably be expected to produce the pain alleged." ***Mickles v. Shalala*, 29 F.3d 918, 924 (4th Cir. 1994).** There must be "at the threshold a

showing by objective evidence of the existence of a medical impairment 'which could reasonably be expected to produce' the actual pain, in the amount and degree, alleged by the [Plaintiff]." ***Id.***, **at 926 (quoting 42 U.S.C. § 423(d)(5)(A)) (other citations omitted);** *see also, Johnson v. Barnhart*, **434 F.3d 650, 657 (4th Cir. 2005); 20 C.F.R. § 404.1529.** Not one of the medical doctors rated Plaintiff as permanently or totally disabled, although they did note some physical limitations in the Plaintiff's use of her left shoulder due to pain, mild disc bulging without nerve involvement, and some reduced motion in the neck and back by reason of pain. As noted and considered by the ALJ, Plaintiff was also evaluated by a psychiatrist in 2003 and 2004 and found to have a depressive as well as a pain disorder.

After considering the massive array of evidence in this case, including the litany of Plaintiff's subjective complaints, the ALJ concluded "that her impairments are 'severe' medically determinable impairments within the meaning of 20 CFR §§ 404.1521 and 416.921 . . ., [but she] has not established an impairment, or combination of impairments, which meets or is medically equal to any of the Listing of Impairments in

Appendix 1, Subpart P of Social Security Regulation No. 4. **Transcript of Proceedings, at 24.**

While concluding that the Plaintiff, a younger individual, could not perform her past relevant work which required full application of her college training, she could perform a wide range of unskilled light work with noted physical and mental limitations. *Id.*, **at 25-27.**

In reviewing the record, the Court has found no treating physician who noted the Plaintiff's mental or physical limitations exceeded in severity those noted by the ALJ.

The hearing before the ALJ was held on May 21, 2004; his decision was issued on August 13, 2004, and refers to physicians' reports issued through April 2004. The record before the Appeals Council contained additional medical evaluations issued into 2005. In fact, the notice sent to the Plaintiff regarding the Appeals Council's denial of her request for review advises that the Council received and considered the new evidence and determined that the ALJ's decision was not contrary to the "weight of *all* the evidence now in the record." *Id.*, **at 6.** While no specific reference is made in the Council's notice as to what new medical evidence was considered, the Council was well aware of such evidence and its obligation

under 20 C.F.R. § 404.970 to consider any new material evidence "relating to the period prior to the ALJ decision in determining whether to grant review[.]" ***Wilkins v. Sec'y of HHS*, 953 F.2d 93, 95 (4th Cir. 1991).** Even so, it chose not to review. The new evidence to which Plaintiff refers relates primarily to examinations occurring after the date of the ALJ's decision and offers the same subjective conclusions the ALJ previously rejected.

Having reviewed the ALJ's decision and the entirety of the record, the Court finds such decision was reached by application of the correct legal standard and was supported by substantial evidence. ***Craig*, 76 F.3d at 589.** The decision will, therefore, be affirmed. ***Id.***

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's motion for summary judgment is **DENIED**, and Defendant's motion for summary judgment is **GRANTED**. A Judgment affirming the Commissioner's decision and dismissing this action is filed herewith.

26

Signed: August 3, 2006

Lacy H. Thornburg
United States District Judge